IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANTHONY CALM, | § | |
| | § | No. 577, 2018 |
| Defendants Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N1712007183 |
| STATE OF DELAWARE | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: December 11, 2019
Decided: February 26, 2020

Before **SEITZ**, Chief Justice; **VALIHURA, VAUGHN**, **TRAYNOR**, Justices; and **MCCORMICK**, Vice Chancellor,[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED IN PART, REVERSED IN PART**.

Santino Ceccotti, Esquire, Office of the Public Defender, Wilmington, Delaware, *Counsel for Appellant.*

Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware (*argued*) and Abby L. Adams, Esquire Department of Justice, Georgetown, Delaware, *Counsel for Appellee.*

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

**TRAYNOR**, Justice, for the Majority:

Anthony Calm was convicted in the Superior Court of several weapons charges and resisting arrest.[1] His sole argument on appeal is that the Superior Court erred in denying his motion to suppress the evidence—a firearm and ammunition—that the arresting officer found on Calm during a stop of a motor vehicle in which Calm was the passenger. Pat-down searches must be justified by a "reasonable articulable suspicion that the detainee is armed and presently dangerous."[2] The Superior Court did not apply this standard. Instead, it concluded that the mere removal of Calm from the vehicle for the purpose of conducting a consent search of the vehicle justified the pat-down of his person. What is more, the court's other findings indicate that, had it applied the correct standard, the court would have found the State's proof lacking and granted the motion to suppress. We therefore reverse Calm's convictions for possession of a firearm by a person prohibited, possession of ammunition by a person prohibited, and carrying a concealed deadly weapon. Because the evidence seized from Calm was not relevant to the resisting-arrest charge, we affirm that conviction.

---

[1] App. to Answering Br. at B22. The State dismissed the additional charge of possession of a weapon with a removed, obliterated or altered serial number. *Id.* at B9.

[2] *Cropper v. State*, 123 A.3d 940, 945 (quoting *State v. Henderson*, 892 A.2d 1061, 1065 (Del. 2006), which, in turn, cites *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

## I. FACTS

In December 2017, Corporals Timothy O'Connor and Aaron Metzner observed a vehicle with illegally tinted windows going 35 miles per hour in a 25 mile-per-hour zone.[3] At the time, the officers were working in the "disrupt" unit of the Wilmington Police Department, the purpose of which was to "seek out high-risk offenders and . . . reduce guns on the street."[4] The officers followed the vehicle for several blocks before conducting a traffic stop.[5] While Corporal Metzner spoke with the driver, Corporal O'Connor addressed Calm, who was in the front passenger seat.[6] When Corporal O'Connor asked Calm for his identification, Calm asked why that was necessary.[7] Although Calm provided his identification after asking this question, Corporal O'Connor interpreted the question to be a "small red flag."[8] During their conversation, Calm also did not make eye contact with Corporal O'Connor and instead looked "straight ahead,"[9] an action that Corporal O'Connor took to be a "second minor red flag."[10]

---

[3] App. to Opening Br. at A20.
[4] *Id.* at A17.
[5] *Id.* at A20.
[6] *Id.*
[7] *Id.* at A21.
[8] *Id.* at A22.
[9] *Id.*
[10] *Id.* at A23.

After the initial conversation, the officers returned to their patrol car and found that the driver was on Level III probation. Calm, however, was neither on probation nor did he have any active capiases or warrants.[11] The officers returned to the detained vehicle, and Corporal Metzner asked the driver if there were any weapons in the car.[12] The driver said that there were none and consented to a search of the vehicle.[13]

After the driver consented to the search, Calm immediately opened the passenger door and stuck one leg out of the car.[14] Although Corporal O'Connor did not describe Calm's movements with particularity, he believed that Calm was attempting to flee, so he promptly blocked the door, and Calm remained in the car.[15] After that, according to Corporal O'Connor, Calm moved excessively in his seat, fidgeted around, checked his pockets, and appeared "extremely nervous."[16] O'Connor testified that those behaviors, combined with his belief that Calm's opening of the door was the beginning of an attempt to flee, caused him to believe that Calm possessed some sort of contraband or possibly a firearm.[17] At that point,

---

[11] *Id.*
[12] *Id.* at A24.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* at A27.
[17] *Id.* at A25.

Corporal O'Connor decided that he was going to remove Calm from the vehicle and pat him down.[18]

The officers removed the driver from the car first. Corporal Metzner patted the driver down and found nothing.[19] The officers then removed Calm from the car, with Corporal O'Connor immediately instructing him to place his hands on the top of the car while holding on to Calm "at his waistband area."[20] Corporal O'Connor then asked Calm "if he had any weapons on him," to which Calm "hesitated for like a brief second" before saying no.[21] Corporal O'Connor explained how this "brief second" hesitation—a "final red flag," in his words—aroused his suspicion that Calm was armed:

> So that to me was like a final red flag because someone that's not in possession of a weapon is pretty confident if their answer, no, I don't have any weapons on me. It's a pretty easy answer. So the fact that he hesitated just a second or so when I asked that question, again, *really at that point made me feel as though he could be in possession of a firearm.*[22]

Then Calm took his hand off the top of the vehicle and moved it toward the left side of his body.[23] Corporal O'Connor immediately grabbed Calm's hand and

---

[18] *Id.* at A27.
[19] *Id.* at A26.
[20] *Id.* at A28–29.
[21] *Id.*
[22] *Id.* at A29 (emphasis added).
[23] *Id.*

5

placed it back on top of the car, but as soon as Corporal O'Connor let go of Calm's hand, Calm shoved away from the car, spun, and attempted to run away.[24] Calm managed three to four steps before Corporal O'Connor, who still had a hand on Calm's belt area, regained his footing and brought Calm "to the ground."[25] Corporal O'Connor then immediately asked Calm what he had on him, to which Calm responded that he had a gun.[26] Corporal O'Connor retrieved the gun, which was located on the left side of Calm's waistband.[27]

A grand jury indicted Calm on charges of possession of a firearm by a person prohibited, possession of ammunition by a person prohibited, carrying a concealed deadly weapon, resisting arrest, and possession of a weapon with an obliterated or altered serial number.[28] The State dismissed the last charge at trial.[29] Calm moved to suppress the evidence of the firearm and ammunition found on his person during the pat-down, claiming that, at the time Corporal O'Connor initiated that pat-down search, he did not have the required suspicion that Calm was armed and dangerous that would justify the search.[30] After hearing Corporal O'Connor's testimony and

---

[24] *Id.*
[25] *Id.* at A30.
[26] *Id.* at A31.
[27] *Id.*
[28] *Id.* at A6–8.
[29] App. to Answering Br. at B9.
[30] App. to Opening Br. at A42. The Superior Court denied Calm's motion to suppress after an evidentiary hearing at which O'Connor testified.

the argument of counsel, the court denied the motion, and the jury found Calm guilty of the remaining charges.[31] The Superior Court sentenced Calm to a total of 5 years of unsuspended Level V imprisonment followed by various levels of probation.[32] Calm appeals his conviction, arguing that the Superior Court erred in denying his motion to suppress the evidence of the firearm and ammunition.

### III. ANALYSIS

"We review the trial court's refusal to grant the motion to suppress evidence under an abuse of discretion standard."[33] In determining whether the trial court abused its discretion in making factual findings, we ask whether there was sufficient evidence to support the findings, and whether those findings were clearly erroneous.[34] Legal conclusions are reviewed *de novo*.[35]

Here, there is no dispute that O'Connor and his partner made a legal traffic stop, given that the vehicle in question was speeding and had tinted windows without the required waiver.[36] "A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver."[37] Nor is there any dispute that O'Connor

---

[31] App. to Answering Br. at B22.
[32] *Id.* at B28–29.
[33] *West v. State*, 143 A.3d 712, 715 (Del. 2016).
[34] *Id.*
[35] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284–85 (Del. 2008).
[36] *Howard v. State*, 931 A.2d 437 (TABLE), 2007 WL 2310001, at *2 (Del. 2007) ("Traffic stops must be supported by reasonable suspicion of criminal activity. Violation of traffic laws constitutes reasonable suspicion.").
[37] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011).

and his partner could remove Calm and the driver from the vehicle after the driver consented to a search of the vehicle.[38] "During a lawful traffic stop, a police officer may order both the driver and passengers out of the vehicle pending completion of the traffic stop."[39] The only dispute is whether, after the driver's consent was given, Corporal O'Connor was justified in initiating a search of Calm's person immediately upon Calm's exit of the vehicle.[40]

An "officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning."[41] Thus, "[a] police officer may not conduct a pat down search of a person during a traffic stop unless the officer [also] has reasonable suspicion that the person subject to the frisk is armed and dangerous."[42] In this area, our law strives to balance two vitally important interests—officer safety and the right of the

---

[38] *See Caldwell v. State*, 780 A.2d 1037, 1047 (Del. 2001) ("Once the officer has issued a citation or warning and has run routine computer checks, the vehicle must be released *unless the driver voluntarily consents to further questioning* or the officer uncovers facts that independently warrant additional investigation." (emphasis added) (citing *Ferris v. State*, 735 A.2d 491, 498–99 (Md. 1999))).

[39] *Id.*

[40] *Terry*, 392 U.S. at 21 ("[I]n justifying the particular intrusion[,] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.").

[41] *Ferris*, 735 A.2d at 499.

[42] *Holden*, 23 A.3d at 847.

8

people to "be secure in their persons . . . from unreasonable searches and seizures."[43] To that end, *Terry v. Ohio* and its progeny recognize that when the police officer can articulate facts that cause her reasonably to suspect that a citizen is armed, a pat-down search is reasonable and therefore permitted in the interest of protecting the officer's safety.[44] "In determining whether reasonable articulable suspicion exists, we must examine the totality of the circumstances surrounding the situation as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[45]

During the suppression hearing, Corporal O'Connor testified to four "red flags" that gave rise to his suspicion that Calm was armed and dangerous: (1) Calm's inquiry into why O'Connor needed his identification,[46] (2) Calm's failure to make eye contact while O'Connor questioned him,[47] (3) Calm's attempt to leave the car after the driver gave his consent for the car to be searched,[48] and (4) Calm's excessive movements, fidgeting, checking of his pockets, and overall "extremely nervous"

---

[43] U.S. CONST. amend. IV; DEL. CONST. art I, §6.
[44] *Terry*, 392 U.S. at 21 (In order to have "reasonable suspicion," "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the frisking.).
[45] *Holden*, 23 A.3d at 847.
[46] App. to Opening Br. at A21–22.
[47] *Id.* at A22–23.
[48] *Id.* at A24–25.

9

demeanor.[49] He also testified to a "final red flag"—Calm's "brief second" hesitation before denying that he was armed—but that occurred after O'Connor had initiated the pat-down.[50]

The Superior Court "[did not] believe [that those initial four factors], in and of [themselves,] . . . would have justified the moving of the defendant and patting him down."[51] That conclusion should have caused the Superior Court to grant the motion to suppress. The court, however, then concluded that "[o]nce [the police officers] remove [the driver and passenger] from the vehicle, they have the right to pat down those individuals for their own protection."[52] That legal conclusion caused the court to find sufficient reasonable and articulable suspicion for the pat-down. But that legal conclusion is incorrect; consent to search the vehicle does not provide consent to search the individual passengers' persons.[53] To conduct such a search requires consent *or* reasonable and articulable suspicion sufficient to justify the search.[54] The Superior Court's conclusion that "[t]he consent is the key that allowed

---

[49] *Id.* at A27.
[50] *Id.*
[51] *Id.* at A42.
[52] *Id.* at A41.
[53] *Holden*, 23 A.3d at 847 ("During a lawful traffic stop, a police officer may order both the driver and passengers out of the vehicle pending completion of the traffic stop. . . . A police officer *may not conduct a pat down search of a person* during a traffic stop *unless* the officer has reasonable suspicion that the person subject to the frisk is armed and dangerous." (emphasis added)).
[54] *Id.*; *Terry*, 392 U.S. at 21.

[the police officers] to remove the defendants" and "[o]nce that happened, . . . to conduct the pat down for their own safety"[55] is thus legal error and requires reversal.

As to the factual findings, however, the Superior Court did not abuse its discretion in finding that Corporal O'Connor lacked a reasonable and articulable suspicion that Calm was armed and dangerous when Corporal O'Connor decided that he would subject Calm to a pat-down. Corporal O'Connor testified that he decided to pat-down Calm *after* blocking Calm's attempt to exit the car but *before* removing him from the car—i.e., *before* the final red flag occurred.[56] And, in any event, the final red flag occurred after the frisk had begun. A police officer may not rely on a suspect's reaction to a search to justify the search itself. As we held in *Jones v. State*, when "an officer attempts to seize someone before possessing reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially."[57] The "final red flag," therefore, can have no bearing on the analysis of whether, at the time Corporal O'Connor decided to conduct a pat-down, he had a reasonable and articulable suspicion that Calm was armed and dangerous.

Although an officer need not presume innocent explanations of otherwise suspicious conduct, Corporal O'Connor himself testified that what really caused him

---

[55] App. to Opening Br. at A42.
[56] *Id.* at A27.
[57] *Jones v. State*, 745 A.2d 856, 874 (Del. 1999).

11

to suspect that Calm was armed was this "final red flag," which occurred after Corporal O'Connor commenced the pat-down. In particular, Corporal O'Connor acknowledged that it was only after Calm had placed his hands on the top of the vehicle at O'Connor's direction while he held on to Calm's waistband that he "really . . . [felt] as though [Calm] could be in possession of a firearm."[58] It was within the trial court's discretion to credit this testimony and find that Corporal O'Connor did not have a reasonable and articulable suspicion that Calm was armed until that final red flag occurred.

Further, the "reasonable suspicion" test is an objective standard, and the trial judge was free to consider whether a reasonable officer would have believed Calm was armed.[59] Here, there is sufficient evidence to find that a reasonable officer would not have had a reasonable and articulable belief that Calm was armed before getting Calm out of the vehicle. For example, a passenger may very well inquire why police officers need his identification for a routine speeding traffic stop given that he was not the one speeding; it is normal to be nervous when stopped by police officers; and it is not unreasonable for a passenger to believe he must exit the car when the driver gives consent to a search of the car.[60] Hence, the trial judge's

---

[58] App. to Opening Br. at A29.
[59] *Terry*, 392 U.S. at 21–22.
[60] This is not to say that Corporal O'Connor was required to credit these innocent explanations, only that we may consider them as we assess the reasonableness of the trial court's factual findings.

determination that Corporal O'Connor's four "red flags" alone did not "reasonably warrant" a pat-down is supported by sufficient evidence and is entitled to deference on appeal.[61]

## IV.  CONCLUSION

The Superior Court's legal conclusion that the officers could pat-down Calm merely by virtue of getting him out of the car is incorrect.  And the Superior Court found that Corporal O'Connor did not have a reasonable articulable suspicion that Calm was armed based only on the four "red flags" that occurred before Calm was removed from the vehicle.  That finding is entitled to deference and is sufficiently supported by the evidence.  It follows that the evidence seized as a result of the pat-down—the firearm and ammunition—must be suppressed, because the pat-down was not justified at the time Corporal O'Connor initiated it.  In the absence of that evidence, Calm's convictions for possession of a firearm by a person prohibited, possession of ammunition by a person prohibited, and carrying a concealed deadly weapon cannot stand.  Calm's conviction for resisting arrest, however, is unaffected. We therefore reverse the Superior Court's judgments of conviction under Counts I (possession of a firearm by a person prohibited), II (possession of ammunition by a person prohibited), and III (carrying a concealed deadly weapon) of the indictment,

---

[61] *Terry*, 392 U.S. at 21; App. to Opening Br. at A42.

and affirm the judgment of conviction under Count V (resisting arrest) of the indictment.

**VAUGHN**, Justice, concurring in part and dissenting in part;

The Superior Court denied the motion to suppress on the theory that the driver's consent to a search of the vehicle allowed the officers to remove the driver and Calm from the vehicle and pat them both down for officer safety. The following excerpt from the transcript is the judge's ruling:

> If the driver had said no, this would have been a much more difficult case because I'm not sure they had justification to pursue anything further at that time. But he did say yes. They searched and they had the right at that point in time to remove both the driver and the passenger from the vehicle. Once they remove them from the vehicle, they have the right to pat down those individuals for their own protection. And the pat down resulted in firearm being found in the defendant's waistband. And there is no basis to suppress that evidence since it was done in a legal pat down for officer safety, as a result of a valid motor vehicle stop and a consent to search a vehicle.[62]

I agree that a driver's consent to a search of a vehicle does not, in and of itself, provide legal justification for a pat-down of a passenger. "A pat-down requires reasonable articulable facts for concern about officer safety that are specific to the person frisked."[63] Accordingly, I agree that Calm's convictions of possession of a firearm

---

[62] App. to Opening Br. at A41:10—A42:1.
[63] *Cropper v. State*, 123 A.3d 940, 946 (Del. 2015) (citing *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979)).

15

by a person prohibited, possession of ammunition by a person prohibited, and carrying a concealed deadly weapon must be reversed.

However, I would not take the additional step of continuing to review the case to decide whether Calm's specific personal conduct justified a pat-down. While this Court reviews a trial court's determination that the totality-of-the-circumstance did (or did not) give rise to reasonable, articulable suspicion to frisk a person *de novo*,[64] it appears to me that the Superior Court did not base its ruling on Calm's specific personal conduct and the attendant circumstances. It left the issue of whether the totality-of-the-circumstances justified a pat-down unresolved. In other words, the court did not expressly determine whether Calm's specific conduct and the attendant circumstances created a reasonable and articulable suspicion for concern about officer safety. As a general rule, I would not decide an issue upon which the trial court did not expressly rule unless the interests of justice required otherwise.

What the judge did say about the circumstances giving rise to the pat-down was that:

> the other factors testified by the officers as to the suspicion certainly provided some further justification for the conducting of the pat down, but I don't believe, in and of itself it would have justified the moving of the defendant and patting him down. The consent is the key that allowed

---

[64] *E.g.*, *State v. Henderson*, 892 A.2d 1061, 1064 (Del. 2006) (en banc) ("The trial judge's determination of whether the police possessed reasonable articulable suspicion to stop and frisk [the defendant] and then seize [contraband] found is a mixed question of law and fact that this Court reviews *de novo*.") (citing *Jones v. State*, 745 A.2d 856, 860 (Del. 1999) (en banc)).

> them to remove the defendants. And once that happened, the defendant's conduct not only – not only were they allowed to conduct the pat down for their own safety, but the defendant's reaction to being removed from the vehicle and being patted down provided the officers with further justification.[65]

The foregoing comments about Calm's conduct are not part of the judge's ruling that the driver's consent to a search of the vehicle gave the officers grounds for the pat-down. In my view they are dicta in a bench ruling and stop short of an express determination by the trial court that the totality of Calm's specific conduct, including his conduct outside as well as inside the vehicle, and the attendant circumstances, did or did not create a reasonable and articulable concern for officer safety. I would remand this case to the Superior Court for further proceedings there, to include findings of fact and a ruling on Calm's motion to suppress applying the correct legal standard.

---

[65] App. to Opening Br. at A42:2-13.

17